UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTICT OF TENNESSEE
NASHVILLE DIVISION

BELLSOUTH TELECOMMUNICATIONS,
LLC d/b/a AT&T TENNESSEE,

       Plaintiff,

v.

METROPOLITAN GOVERNMENT
OF NASHVILLE AND DAVIDSON
COUNTY, TENNESSEE, et al.,

       Defendants.

-------*consolidated with*----------------|

COMCAST OF NASHVILLE I, LLC,

       Plaintiff,

v.

METROPOLITAN GOVERNMENT
OF NASHVILLE AND DAVIDSON
COUNTY, TENNESSEE, et al.,

       Defendants.

_____/

Case No. 16-2509
Honorable Victoria A. Roberts


Case No. 16-2794
Honorable Victoria A. Roberts

## ORDER: (1) GRANTING IN PART, DENYING IN PART, AND RESERVING RULING IN PART ON PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT [Docs. 44, 49] AND DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [Doc. 77]; and (2) DENYING DEFENDANTS' MOTION FOR TIME TO TAKE DISCOVERY [Doc. 65]

## I.    INTRODUCTION

Plaintiffs provide telecommunications services in Nashville, Tennessee.

Components of their networks are attached to utility poles located in the public rights-of-

way. In this highly competitive business, potential competitors to AT&T and Comcast

need access to these same utility poles to attach their own equipment. These

consolidated lawsuits center around an Ordinance adopted by the Metro Nashville Council to streamline this access process.

Plaintiffs challenge the Ordinance under both state and federal law. They seek a judgment declaring the Ordinance unlawful and a permanent injunction restraining its enforcement. Specifically, Plaintiffs say the Ordinance: (1) is preempted by federal law; (2) contravenes the Metro Nashville Charter in violation of state law; and (3) violates the Contract Clauses of the United States and Tennessee Constitutions.

Among other things, Defendants argue that: (1) Plaintiffs lack standing and have no private right of action to assert their second claim; and (2) all of Plaintiffs' claims fail as a matter of law because the Ordinance is a valid exercise of Metro Nashville's authority to manage its public rights-of-way.

The Court **GRANTS IN PART**, **DENIES IN PART**, and **RESERVES RULING IN PART** on Plaintiffs' motions for summary judgment [Docs. 44, 49] and Defendants' motion for summary judgment [Doc. 77], as follows:

1. Plaintiffs' motions are **GRANTED**, and Defendants' motion is **DENIED** on Claim I. The Court **DECLARES** that the Ordinance is preempted by federal law as applied to utility poles owned by AT&T and other private parties. Defendants are **PERMANENTLY ENJOINED** from applying the Ordinance to utility poles owned by AT&T and other private parties;

2. On Count II, the Court **RESERVES RULING** on the motions. Plaintiffs may amend their complaints by

December 6, 2017, to add NES as a party and to invoke the

Tennessee Declaratory Judgment Act. Plaintiffs must serve

NES with the amended complaint and this Order within one

week of filing the amended complaints. NES must file a

preliminary response – as explained on pages 30-32, below

– within one week of being served, and may further answer

or respond as permitted by the Federal Rules of Civil

Procedure;

3.      The Court **GRANTS** Defendants' motion and **DENIES**

Plaintiffs' motions on Count III. The Court grants Defendants

summary judgment on Plaintiffs' claims under the Contract

Clause of the United States and Tennessee Constitutions.

Defendants' motion to allow time for discovery [Doc. 65] is **DENIED**.

## II.    BACKGROUND

### A.    Definitions

The Court believes it would be useful to set forth the definitions of terminology

that will be used throughout this Order:

**Attachment Agreement** – an agreement between a utility pole owner and an Existing Attacher covering, *inter alia*, the terms of Attachments to poles and process for performing Make-Ready Work;

**Attachments** – wires, antennas, lines, and other communications equipment attached to utility poles;

**Complex Make-Ready Work** – Make-Ready Work that will cause or would reasonably be expected to cause a customer outage;

**Defendants** – Metro Nashville; the Mayor of Metro Nashville, Megan Barry; and the Interim Director of Metro Nashville's Department of Public Works, Mark Sturtevant;

**Electric Power Board** – the Electric Power Board of Metro Nashville; operates as NES;

**Existing Attacher** – a telecommunications provider with Existing Attachments on a particular utility pole;

**Existing Attachments** – Attachments already affixed to a utility pole;

**FCC** – the Federal Communications Commission;

**Make-Ready Work** or **Make-Ready Process** – rearranging, transferring, altering, or otherwise moving Existing Attachments so that a utility pole can accommodate a New Attacher's Attachments;

**Metro Charter** or **Charter** – the Metro Nashville Charter;

**Metro Nashville** – Metropolitan Government of Nashville and Davidson County;

**NES** – Nashville Electric Service; a municipal public utility managed and controlled by the Electric Power Board;

**New Attacher** – a telecommunications provider seeking to add Attachments to a utility pole;

**One-Touch Make-Ready Policy** or **Climb Once Policy** – a policy which seeks to avoid delays by having all Make-Ready Work performed at the same time by a single crew or contractor, as opposed to having each Existing Attacher perform its own Make-Ready Work at different times;

**Ordinance** – Ordinance No. BL2016-343;

**Plaintiffs** – BellSouth Telecommunications, LLC ("**AT&T**") and Comcast of Nashville I, LLC ("**Comcast**");

**The Act** – the Federal Communications Act of 1934.

## B.     Plaintiffs' Networks and the Make-Ready Process in Metro Nashville

Components of Plaintiffs' telecommunications network are attached to over

100,000 utility poles in the Metro Nashville area, a significant number of which are in the

4

public rights-of-way. NES owns approximately 80 percent of the utility poles in the Metro Nashville area; AT&T owns the majority of the remaining 20 percent.

When a new telecommunications provider enters a market, it needs access to existing utility poles to attach its equipment. Typically, if not always, a New Attacher cannot attach equipment to a utility pole until Existing Attachers rearrange their Attachments to create sufficient space.

Regulation of Attachments on poles owned by NES and AT&T is largely controlled by Attachment Agreements. Plaintiffs each operate under Attachment Agreements with NES. Plaintiffs' agreements with NES, like most Attachment Agreements, require that the Existing Attacher move its own Attachments.

Among other things, AT&T's agreement with NES ("AT&T Agreement") states, "[e]xcept as herein otherwise expressly provided, each party shall place, maintain, rearrange, transfer and remove its own attachments, and shall at all times perform such work promptly." *AT&T Agreement*, Art. VI(B). If AT&T fails to perform this obligation, "[NES] may elect to do such work, and [AT&T] shall reimburse [it] for the cost." *Id.*, Art. XIV(B).

Under Comcast's agreement with NES ("Comcast Agreement"), when NES determines that Make-Ready Work to Comcast's Attachments is necessary, Comcast must perform the required work within 30 days after receiving notice from NES. *Comcast Agreement*, Art. 12.1. If Comcast does not move its Attachments within 30 days, it is subject to a five-dollar penalty per Attachment for each day after the thirtieth (30th) day in which the work remains incomplete. *Id.*, Exhibit A. Moreover, beginning on the sixtieth (60th) day after Comcast receives notice, NES may perform the Make-

Ready Work or delegate that authority to a New Attacher using a qualified contractor. *See Comcast Agreement*, Art. 12.1, 12.1.1.

Because of the highly competitive nature of the industry and different types of service providers (e.g., telephone, cable, and internet), there can be as many as fourteen different Existing Attachments on a single utility pole. When each Existing Attacher performs its own Make-Ready Work at different times, the process can take months to complete and can involve numerous road or sidewalk closures when the pole being worked on is in a public right-of-way.

### C. Metro Nashville Adopts the Ordinance

The Metro Nashville Council passed the Ordinance on September 20, 2016; Mayor Barry signed it into law the following day. The Ordinance amends the Metro Nashville Code of Laws by adding Chapter 13.18 titled "Management of Public Rights-of-Way for Make Ready Work." Generally, the Ordinance adopts a One Touch Make Ready/Climb Once Policy.

Under the Ordinance, a New Attacher must submit an Attachment application to the utility pole owner and get the owners' approval. Upon approval, the Ordinance authorizes a New Attacher to perform Make-Ready Work, so long as it complies with two limitations: (1) the New Attacher may not perform Make-Ready Work "without first providing fifteen (15) days' prior written notice . . . to the applicable [Existing Attacher]"; and (2) the New Attacher may not perform Complex Make-Ready Work "without first providing thirty (30) days' prior written notice . . . to the applicable [Existing Attacher]." *See* Ordinance, § 13.18.020(A)(1), (4).

The Ordinance preamble states that its purpose is "to facilitate the efficient construction or upgrade of communications networks on utility poles located in the public rights-of-way while promoting and protecting public safety and reducing inconvenience to [Metro Nashville] residents and businesses from the construction." Metro Nashville says it adopted the Ordinance: (1) to reduce the number of traffic disruptions, road closures and sidewalk closures caused by the traditional Make-Ready Process – during which numerous Existing Attachers typically move their own facilities at different times; and (2) to correspondingly increase safety.

**D.      Plaintiffs Challenge the Ordinance**

AT&T filed suit challenging the Ordinance on September 22, 2016; Comcast filed its case in October 2016.  Because the challenges are on the same grounds, the Court consolidated the cases.

Plaintiffs allege that the Ordinance: (1) is preempted by federal law to the extent it applies to AT&T's utility poles and other privately owned poles; (2) violates the Metro Charter as it applies to NES-owned poles; and (3) substantially impairs their agreements with NES, in violation of the Contract Clauses of the United States and Tennessee Constitutions.

Plaintiffs say the Ordinance upsets their expectations and conflicts with their rights under federal law and their agreements with NES by, among other things, reducing the amount of time they have to perform Make-Ready Work on their own Attachments from 60 days to 15 days for normal Make-Ready Work.  This, Plaintiffs say, will make it less feasible, and in some cases impossible, to move their own Attachments.  As a result, they claim that the Ordinance effectively permits a New

Attacher to temporarily seize their property and alter or rearrange it without consent and with little notice.  Further, Plaintiffs say that because the Ordinance deprives them of an adequate opportunity to assess possible network disruption, and because the New Attacher moving their Attachments will have less knowledge about their networks, it will increase the risk of outages and disruptions to their networks.

## III.  STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), "[t]he Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The movant bears the initial burden to inform the Court of the basis for the motion, and must identify particular portions of the record which demonstrate the absence of a genuine dispute as to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the movant satisfies its burden, the non-moving party must set forth specific facts showing a genuine issue for trial.  *Id.* at 324.

In deciding a summary judgment motion, the Court "views the factual evidence and draws all reasonable inferences in favor of the nonmoving party."  *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  The Court need consider only the cited materials, but it may consider other evidence in the record.  Fed. R. Civ. P. 56(c)(3).  "[O]n cross-motions for summary judgment, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 692 (6th Cir. 2001) (citation and internal quotation marks omitted).

IV.     **ANALYSIS**

A.     **Count I – The Ordinance is Preempted by Federal Law**

The first of Plaintiffs' three challenges is that the Ordinance – as applied to privately owned utility poles, such as AT&T's – is preempted because it conflicts with federal law, including 47 U.S.C. § 224 and the pole attachment rules and regulations promulgated by the FCC, 47 C.F.R. § 1.1401, *et seq*.  The Court agrees.

State laws are "naturally preempted" to the extent they conflict with federal law. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).  "This includes cases where compliance with both federal and state regulations is a physical impossibility, and those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399-400 (2012) (internal citations and quotation marks omitted).

What constitutes a "sufficient obstacle" is "a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects. . . ."  *Crosby*, 530 U.S. at 373.  In deciding whether federal law preempts a state law, the Court "assume[s] that the historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress."  *Arizona*, 568 U.S. at 400 (citations and internal quotation marks omitted).

The Act grants the FCC authority to "regulate the rates, terms, and conditions for pole attachments" and to promulgate rules and regulations to that effect.  *See* 47 U.S.C. § 224(b).

A state can opt out of FCC jurisdiction over pole attachments – and render the FCC rules and regulations on pole attachments non-binding – if it certifies to the FCC that it regulates pole attachments. *See* 47 U.S.C. § 224(c). In this "reverse-preemption" provision, the FCC acknowledges that it "retains jurisdiction over pole attachments only in states that do not so certify." *See In re Implementation of Section 224 of the Act*, 26 FCC Rcd. 5240, 5243 ¶ 7 (2011) ("*2011 Pole Attachment Order*").

Tennessee has not opted out of FCC jurisdiction over pole attachments.

The FCC explained that "state and local requirements affecting attachments are entitled to deference even if the state has not sought to preempt federal regulations under section 224(c)." *In re Implementation of the Local Competition Provisions in the Telecomm. Act of 1996*, 11 FCC Rcd. 15499, 16072 ¶ 1154 (1996) ("*1996 FCC Order*"). In such instances, "state and local requirements affecting pole attachments remain applicable, unless a complainant can show a direct conflict with federal policy. Where a local requirement directly conflicts with a rule or guideline [of the FCC], [the FCC] rules will prevail." *Id.* at 16072-73 ¶ 1154.

A closer look at the FCC's regulations and the 2011 Pole Attachment Order demonstrates that the Ordinance directly conflicts with the rules and timeline adopted by the FCC for pole attachments.

In 2011, the FCC decided a "more detailed framework to govern the rates, terms and conditions for pole attachments" was "necessary [to provide] guidance to both pole owners and attachers." *2011 Pole Attachment Order*, 26 FCC Rcd. at 5242-43 ¶ 5, 5250 ¶ 21. After an extensive notice and comment process, *see id.* at 5285 ¶ 96, the FCC "adopt[ed] a specific timeline for processing pole attachment requests," which

consists of the following four stages, once a New Attacher submits a complete

application to the pole owner:

> Stage 1: Survey.  During the 45-day survey phase, the pole owner
> conducts an engineering study to determine whether and where
> attachment is feasible, and what make-ready is required. (This period has
> an additional 15 days for large[r] orders as defined [by 47 C.F.R. §
> 1.1420(g)]).
>
> Stage 2: Estimate.  The pole owner provides an estimate of the make-
> ready charges within 14 days of receiving the results of the engineering
> survey.
>
> Stage 3: Attacher Acceptance.  The attacher has up to 14 days to approve
> the estimate and provide payment.
>
> Stage 4: Make-Ready.  The pole owner must notify any attachers with
> facilities already on the pole that make-ready for a new attacher needs to
> be performed within 60 days (or 105 days in the case of larger orders, as
> defined [by 47 C.F.R. § 1.1420(g)]).  In most cases, any required make-
> ready work will be completed within this period, but we provide for
> additional time in certain circumstances. . . .Finally, a[] [pole] owner may
> take 15 additional days after the make-ready period runs to complete
> make-ready itself [if existing attachers failed to move their attachments
> within the time prescribed]."

*2011 Pole Attachment Order*, 26 FCC Rcd. at 5250-52 ¶¶ 19, 21-22 (internal endnotes

omitted); *see also* 47 C.F.R. § 1.1420(c)-(e).

The FCC's pole attachment regulations provide a "remedy" to a New Attacher if

an Existing Attacher fails to move its Attachments within 60 days (or 105 days for larger

orders).  This remedy allows the New Attacher to "hire contractors authorized by the

[pole owner] to complete make-ready either on the 133rd day or 148th day, depending

on whether [the pole] owner timely notifies the [new] attacher that it intends to move

existing facilities and conduct make-ready if existing attachers have failed to move their

attachments."  *Id.* at 5252 ¶ 23.  Only then may a New Attacher move Existing

Attachments under the FCC's rules.  *See id.* at 5258 ¶ 32 ("if existing attachers have not

moved their facilities within 60 days of notification, the [pole owner] or [new] attacher may move the facilities for them").

In adopting the timeline for pole attachments, the FCC considered shorter time limits for Existing Attachers to perform Make-Ready Work, including 30-day and 45-day deadlines, but "decline[d] to adopt" them. *See id.* at 5258 ¶ 32. The FCC explained that it "adopt[ed] 60 days for the make-ready stage in the communications space in order to (1) synchronize make-ready with the [its] existing rules that give entities with existing attachments 60 days to move them before a pole owner modifies a pole, and (2) promote a higher success rate that attachers and their investors can depend on." *Id.* at 5257 ¶ 31 (internal endnotes omitted).

Finally, the FCC found "that the rules we adopt to facilitate access, combined with the conditions and protections we impose, strike the proper balance between encouraging deployment of facilities and safeguarding the network." *2011 Pole Attachment Order*, 26 FCC Rcd. at 5270 ¶ 61.

Comparing the Ordinance to the FCC's four-stage timeline, the Court finds that the Ordinance directly conflicts with FCC pole attachment rules and regulations.

The Ordinance adopts a 15-day deadline for Existing Attachers to complete Make-Ready Work, as compared to the FCC's 60-day deadline. This compressed deadline is considerably shorter than even the 30- and 45-day deadlines considered, but expressly rejected, by the FCC.

The Ordinance's blanket 15-day deadline for Existing Attachers to perform Make-Ready Work stands as a direct obstacle to the objective expressed by the FCC.

Considering this, alone, the Ordinance "conflicts" with federal law.  *See Arizona*, 567 U.S. at 399-400.

Moreover, as Plaintiffs contend, the Ordinance is silent on and largely dispenses with the first three stages of the FCC's four-stage timeline for processing pole attachment requests.  Defendants contend that the Ordinance does not displace the FCC's rules, but rather "it provides another avenue for the attacher."  [Doc. 106, PgID 1301].  However, by providing "another avenue" for a New Attacher, the Ordinance completely disregards the carefully calibrated procedure adopted by the FCC.  The Ordinance is inconsistent with the FCC's four-stage timeline for pole attachments.  *See Verizon N., Inc. v. Strand*, 309 F.3d 935, 941 (6th Cir. 2002) (finding preemption where the state law "completely bypasses and ignores the detailed process . . . set out by [federal law]").

In addition, as Comcast claims, "the Ordinance turns the FCC's regulatory regime on its head by taking a narrow exception and transforming it into the default rule."  The FCC's intent in adopting its timeline was for New Attachers to be able to move Existing Attachments only as a "remedy," if Existing Attachers failed to move their facilities within the 60-day (or 105-day) stage to perform Make-Ready Work.  *See 2011 Pole Attachment Order*, 26 FCC Rcd. at 5252 ¶ 22 ("[i]n most cases, any required make-ready work will be completed [by existing attachers] within [the 60 day or 105 day make-ready] period").  Yet, under the Ordinance, the default rule provides that Existing Attachers "shall allow" New Attachers "to perform Make Ready . . . [upon] fifteen (15) days' prior written notice."

Metro Nashville says the Ordinance does not conflict with or preempt the FCC's pole attachment regulations because it advances the FCC's goals by allowing Make-Ready Work to be completed more efficiently. This argument is unavailing; method and means are within the ambit of preemption.

While the Ordinance may result in a more expeditious Make-Ready Process, it ignores one-half of the equation considered by the FCC – i.e., "safeguarding the network" – and disregards the balance struck in adopting the 60-day deadline. *See 2011 Pole Attachment Order*, 26 FCC Rcd. at 5270 ¶ 61 ("We find that the rules we adopt to facilitate access, combined with the conditions and protections we impose, strike the proper balance between encouraging deployment of facilities and safeguarding the network.").

Moreover, "[i]n determining whether state law 'stands as an obstacle' to the full implementation of a federal law, 'it is not enough to say that the ultimate goal of both federal and state law' is the same." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 103 (1992) (citations omitted). Rather, "state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach that goal." *Id.* (citation omitted); *see also Crosby*, 530 U.S. at 379-80 ("The fact of a common end hardly neutralizes conflicting means. . .Conflict is imminent when two separate remedies are brought to bear on the same activity."). The Ordinance undermines the four-stage timeline for processing pole attachments, directly interfering with the methods adopted by the FCC to balance between deployment of facilities and safeguarding the network.

Defendants make several other arguments in an attempt to show that the Ordinance is not preempted. However, none changes the fact that the Ordinance is an

obstacle to achieving congressional purposes and objectives, as discussed above. Moreover, the Court declines Defendants' request to refer the preemption claim to the FCC under the doctrine of primary jurisdiction.

The Ordinance is preempted by 47 U.S.C. § 224 and the FCC's pole attachment regulations to the extent they apply to privately owned utility poles.  AT&T's poles are subject only to the FCC's rules and regulations, including its four-stage timeline for processing pole attachment requests.  Defendants cannot require AT&T to comply with the provisions of the Ordinance as it relates to its poles.

**B.      Count II – Plaintiffs Have Standing and a Private Right of Action; The Ordinance is *Ultra Vires* because Defendants Violated the Metro Charter in Adopting It**

In Count II, Plaintiffs claim the Ordinance is *ultra vires* and invalid as applied to NES-owned utility poles because Defendants exceeded their authority under the Metro Charter in enacting it.  Specifically, Plaintiffs say the Charter grants NES the exclusive authority to regulate the operation and management of NES-owned utility poles, including the terms of Attachments to those poles, and that Metro Nashville's Council and Mayor Barry impermissibly impinged on that authority in enacting the Ordinance. Plaintiffs seek both a declaration that the Ordinance is invalid and an injunction restraining Defendants from enforcing it.

Defendants contend that this claim should be dismissed because: (1) Plaintiffs do not have standing to bring it; (2) "neither the [Metro] Charter, nor state law provides any private right of action allowing enforcement, damages or attorneys' fees"; and (3) NES is an indispensable party under Fed. R. Civ. P. 19.  Defendants also argue that the

Ordinance is not *ultra vires* because it constitutes a proper exercise of Metro Nashville's police powers and does not conflict with NES's authority under the Charter.

### 1. Plaintiffs Have Standing

There are two types of standing – Article III (constitutional) standing and prudential/statutory (non-constitutional) standing.

Although Defendants initially set forth a one-sentence, conclusory statement that AT&T alleged only hypothetical injuries, it appears they abandoned this position and conceded that Plaintiffs satisfy Article III's "injury in fact" requirement.

The crux of Defendants' standing challenge is that Plaintiffs lack prudential standing to bring this claim because they assert NES's rights, as opposed to their own; the majority of Defendants' standing analysis addresses whether Plaintiffs satisfy the applicable standard for third-party standing (i.e., standing to assert the right or interest of a third party).

AT&T and Comcast clarify that they are not relying on third-party standing to assert a claim on NES's behalf, nor are they relying on NES's rights or interests; rather, Plaintiffs assert their own right to be free from what they say is an unlawfully adopted ordinance. Accordingly, because Plaintiffs assert their own rights, as opposed to the rights of NES, Defendants' third-party standing argument is not on point. *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 80-81 (1978) ("Where a party champions his own rights . . . the basic practical and prudential concerns underlying the standing doctrine are generally satisfied.").

Defendants make no other standing arguments.  However, because Article III standing is jurisdictional, the Court addresses whether the rights/interests asserted by Plaintiffs satisfy Article III's "case or controversy" requirement.

### a.   Article III Standing

Article III standing is a jurisdictional requirement, which must be established by the party invoking federal jurisdiction.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-62 (1992).  In evaluating standing, a court must "determine[] whether Plaintiffs have such a personal stake in the outcome of the controversy as to warrant their invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on their behalf."  *Soehnlen v. Fleet Owners Ins. Fund*, 844 F.3d 576, 581 (6th Cir. 2016) (citations, internal quotation marks, and brackets omitted).  Article III standing requires a plaintiff to show that: (1) it has suffered an "injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical"; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Lujan*, 504 U.S. at 560-61 (citations and internal quotation marks omitted).

Plaintiffs have a personal interest in, and the right to, proper application of the law.  *See id.* at 573-74 ("every citizen[] [has an] interest in proper application of the Constitution and laws. . ."); *Fairchild v. Hughes*, 258 U.S. 126, 129 (1922) ("Plaintiff has [asserted] only the right, possessed by every citizen, to require that the government be administered according to law. . . .").  *See also Bond v. United States*, 564 U.S. 211, 223-24 (2011) ("[I]ndividuals, too, are protected by the operations of separation of

powers and checks and balances; and they [may rely] on those principles in otherwise justiciable cases and controversies.").

However, "a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." *Lujan*, 504 U.S. at 573-74. Rather, a plaintiff must demonstrate an interest or injury that is "particularized" – that is, "the injury must affect the plaintiff in a personal and individual way." *Id.* at 560 n.1; *see also Cobb v. Shelby Cty. Bd. of Comm'rs.*, No. 93830-2, 1987 WL 28065, at *3 (Tenn. Ct. App. Dec. 17, 1987) (to have standing, a citizen questioning the conduct of a municipality must allege "a special injury, status or relation affecting [him or her] individually . . . . Generally, the prime test of this inquiry as to special injury or interest is that it not be common to the body of citizens as a whole.").

Plaintiffs allege special injuries and interests that are not common to every person; the relief they seek directly and tangibly benefits their interests more than it benefits the general public. Unlike the public at large, Plaintiffs have equipment and integral parts of their network attached to NES's poles that will be directly affected by the Ordinance. This is precisely the concrete and particularized injury required for Article III standing.

Plaintiffs satisfy the other prerequisites for Article III standing as well: their injury is directly traceable to the challenged conduct, and it is redressable by invalidation of the Ordinance.

### b.    Prudential Standing

"'Prudential standing' is established upon a determination that 'the plaintiff is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers.'" *Ditto v. Delaware Sav. Bank*, No. E2006-01439, 2007 WL 471146, at *3 (Tenn. Ct. App. Feb. 14, 2007) (citation omitted).  The Supreme Court recently clarified that prudential standing "in fact is not a standing issue, but simply a question of whether the particular plaintiff 'has a cause of action under the statute.'" *Soehnlen v. Fleet Owners Ins. Fund*, 844 F.3d 576, 581 (6th Cir. 2016) (quoting *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, ---- U.S. ----, 134 S.Ct. 1377, 1386 (2014))).  Among the matters to consider when evaluating prudential standing is "whether the plaintiff is asserting his or her own legal rights and interest[s] rather than the legal rights and interests of third parties."  *Ditto*, 2007 WL 471146, at *3.

The Court has determined that Plaintiffs assert their own legal interests and rights.  Next, the Court addresses whether they have a cause of action.

### 2.  Plaintiffs Have a Private Right of Action

Defendants contend that this claim fails because "neither the Metro[] Charter nor state law provides any private rights of action on this claim."

Although the Charter may not contain express language creating one, the Court finds that a private right of action exists by implication, and that Tennessee law gives Plaintiffs the right to challenge the Ordinance as *ultra vires*; they have a special interest and/or injury not common to the public at large.

Where a statute does not expressly provide a private right of action, courts must determine if the legislature intended to create such a right. *See Ergon, Inc. v. Amoco Oil Co.*, 966 F. Supp. 577, 584 (W.D. Tenn. 1997) (applying Tennessee law). "[U]nless the legislative intent to create a private right of action 'can be inferred from the language of the statute, the statutory structure, *or some other source*, the essential predicate for implication of a private remedy simply does not exist.'" *Id.* (emphasis added) (quoting *Thompson v. Thompson*, 484 U.S. 174, 179 (1988)). In determining whether the legislature intended to create a private right of action, appropriate factors for the Court to consider include: (1) whether there is any indication of legislative intent, express or implied, to create or deny a private right of action; (2) whether implying a private right of action is consistent with the underlying purposes of the legislation; and (3) whether the plaintiff is an intended beneficiary within the protection of the statute. *Brown v. Tennessee Title Loans, Inc.*, 328 S.W.3d 850, 855 (Tenn. 2010).

### a. That Plaintiffs Have a Private Right of Action is Consistent with Legislative Intent and the Underlying Purposes of the Legislation

This case is analogous to a recent Tennessee state court case in which the plaintiff sought a declaratory judgment that a county water authority exceeded its power under the Tennessee Water and Wastewater Treatment Authority Act ("WWTA Act") by imposing a particular charge. *Am. Heritage Apartments, Inc. v. Hamilton Cty. Water & Wastewater Treatment Auth.*, No. E2014-00302, 2015 WL 399215, at *1, *6 (Tenn. Ct. App. Jan. 30, 2015), *aff'd in part, rev'd in part*, 494 S.W.3d 31, 52 (Tenn. 2016).

Although the WWTA Act did not provide an express private right of action, the Tennessee Court of Appeals concluded that the plaintiff had a private right of action to

assert its *ultra vires* claim under the WWTA Act, upon finding that: (1) express legislative intent granted defendant the authority to sue and be sued, and there was no legislative intent, express or implied, to deny a private right of action; (2) implying a private right of action was consistent with the underlying public purpose of the Act, which stated that the purpose of the public water authority's operation was for "a public and governmental purpose"; and (3) as a customer of defendant, plaintiff was an intended beneficiary of the protection provided by the WWTA Act. *Id.* at *9. The Court of Appeals also noted that because "[g]overnmental immunity does not extend to *ultra vires* claims," implying a private cause of action was "consistent with the constraints of governmental immunity" and Tennessee law. *See id.* (although the Tennessee Supreme Court later reversed in part on a separate, unrelated issue, it "agree[d] with the analysis and conclusion of the Court of Appeals' holding and adopt[ed] its reasoning" on the issue of whether a private right of action existed, *see Am. Heritage*, 494 S.W.3d at 52).

The analysis here is similar. Section 1.01 of the Metro Charter expressly grants Metro Nashville the authority to sue and be sued, and there is no indication of legislative intent, express or implied, to deny a private right of action which seeks a declaration that an act taken by Metro Nashville was *ultra vires*. *American Heritage* confirms that Tennessee law contemplates a private right of action to challenge a municipality's act as *ultra vires*. *See id.* at *6; *see also City of Lebanon v. Baird*, 756 S.W.2d 236, 241 (Tenn. 1988) (explaining when a municipal act may be declared *ultra vires* under Tennessee law).

Moreover, implying a private right of action is consistent with the purpose of the Charter. Because the provisions of the Metro Charter are "mandatory[] and must be obeyed by the city and its agents," *see Baird*, 756 S.W.2d at 241, finding that no private right of action exists to challenge an alleged *ultra vires* act would render meaningless the mandatory nature of the Charter's terms and conflict with "the long-standing principle in Tennessee that citizens have standing to challenge the actions of public officials where they 'aver special interest or a special injury not common to the public generally.'" *Renteria-Villegas v. Metro. Gov't of Nashville & Davidson Cty.*, 796 F. Supp. 2d 900, 909 (M.D. Tenn. 2011) (quoting *Bennett v. Stutts*, 521 S.W.2d 575, 576 (Tenn.1975)); *see also Patten v. City of Chattanooga*, 108 Tenn. 197, 65 S.W. 414, 420 (1901) ("There is no question as to the jurisdiction of the chancery court to restrain municipal ordinances upon the ground that they are beyond the powers conferred upon the municipality, or that they were not passed regularly or according to the forms of law. There is no question that anyone who suffers or will suffer a special injury may maintain a suit to test the validity of an ordinance upon either of these grounds. . . .").

### b. Plaintiffs are Intended Beneficiaries Within the Protection of the Metro Charter

Plaintiffs are intended beneficiaries within the protection of the Charter based on their contractual relationships with NES.

By entering into Attachment Agreements with Plaintiffs, NES acted pursuant to the exclusive authority the Charter grants it over the operation and maintenance of its properties, including its utility poles. Quite reasonably, Plaintiffs assumed that NES was the appropriate party to negotiate with, and that it was the party with the authority to regulate access to its poles. By adopting the Ordinance, Metro Nashville unilaterally

changed the procedure for attaching to NES's poles, and allegedly impaired Plaintiffs' rights under their agreements with NES in the process.

Because Plaintiffs' agreements with NES arose pursuant to NES's power under the Charter, Plaintiffs are intended beneficiaries within the protection of the Charter. This gives them the right to test the validity of the Ordinance upon showing a special interest or injury. Finding otherwise would provide an avenue for Metro Nashville to exceed its powers under the Charter or violate the Charter's terms without recourse, contrary to Tennessee law.

### c.      The Legislature Intended to Create a Cause of Action

Considering the *Brown* factors, the Court finds that the legislature intended to create a private right of action under the Charter for those who – like Plaintiffs – both have a special interest and/or injury not common to the public at large and satisfy other justiciability requirements. Such persons may challenge acts taken by Metro Nashville as *ultra vires*.

Moreover, Plaintiffs have a vehicle to challenge the Ordinance through the Tennessee Declaratory Judgment Act:

> "Any person . . . whose rights, status, or other legal relations are affected by a . . . municipal ordinance . . . may have determined any question of construction or validity arising under the . . . ordinance . . . and obtain a declaration of rights, status or other legal relations thereunder."

Tenn. Code Ann. § 29-14-103; *see also id.*, § 29-14-101 (defining "person" to include an "unincorporated association"). The Act grants courts with appropriate jurisdiction "the power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." *Id.*, § 29-14-102. Courts may grant "[f]urther relief based on a declaratory judgment" – such as an injunction – "whenever necessary or proper." *Id.*, §

29-14-110.  Because such relief is "remedial in nature," courts must construe the Declaratory Judgment Act "broadly in order to accomplish [its] purpose." *Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 837 (Tenn. 2008); Tenn. Code Ann. § 29-14-113 (the Act must "be liberally construed and administered").

Defendants cite *Tennessee Firearms Ass'n v. Metro. Gov't of Nashville & Davidson Cty.*, No. M2016-01782, 2017 WL 2590209 (Tenn. Ct. App. June 15, 2017), and argue that the Tennessee Declaratory Judgment Act does not confer an independent, stand-alone cause of action.  *Id.* at *8-*9; *see also Carter v. Slatery*, No. M2015-00554, 2016 WL 1268110, at *5 (Tenn. Ct. App. Feb. 19, 2016) (noting that "[a] declaratory judgment act is not an express independent source of subject matter jurisdiction, and ordinarily does not by itself grant or otherwise create jurisdiction. [For] a court [to] have jurisdiction to render a declaratory judgment[,] . . . jurisdiction must exist independent of the declaratory judgment statute." (citation omitted)).

While that may be true, *Tennessee Firearms* is not on point and does not govern. Plaintiffs do have a private right of action to litigate alleged *ultra vires* conduct; and they set forth a justiciable controversy within the Court's jurisdiction.

### 3.  The Ordinance is *Ultra Vires*

"Fundamental in Tennessee law is that municipalities may exercise only those express or necessarily implied powers delegated to them by the Legislature in their charters or under statutes.  The provisions of the charter are mandatory, and must be obeyed by the city and its agents."  *Allmand v. Pavletic*, 292 S.W.3d 618, 625 (Tenn. 2009) (internal citations and quotation marks omitted).  If a municipality violates the terms of its charter, "the action is *ultra vires* and void or voidable."  *Baird*, 756 S.W.2d at

241 (citation omitted). "Under Tennessee law, a municipal action may be declared *ultra vires* for either of two reasons: (1) because the action was wholly outside the scope of the city's authority under its charter or a statute, or (2) because the action was not undertaken consistent with the mandatory provisions of its charter or a statute." *Id.*

Under the Charter, the Metro Nashville Council has the power to pass ordinances "necessary for the health, convenience, safety and general welfare of the [public]" and the power to manage its public rights-of-way. *See* Metro Charter, Art. 2, § 2.01, ¶¶ 23, 40. To that end, Metro Nashville enacted Metro Code § 13.08.030, which provides that "[n]o person, firm or entity shall construct, install, operate and/or maintain an encroachment in, on, over, or under any street, road, alley, sidewalk or other public way except when permitted by the metropolitan government." Defendants say they adopted the Ordinance as an exercise of these powers.

However, the Metro Charter also states that "when any power is vested by this Charter in a specific officer, board, commission or other agency, the same shall be deemed to have exclusive jurisdiction within the particular field." Metro Charter, Art. 2, § 2.01, ¶ 36. This provision is particularly relevant here: the Electric Power Board/NES is an agency of Metro Nashville in which the Charter vests certain powers. *See* Metro Charter, Art. 11, Ch. 3, § 11.301 (the Electric Power Board "shall . . . function as an agency of [Metro Nashville], and shall have all the rights, duties, powers, obligations, privileges and responsibilities as are contained in the . . . [Metro] Charter").

Under Article 42 of Appendix 3 of the Charter, NES has the power "to maintain and operate the electric power plant, distribution system, substation, etc." and has "full control over the erection, construction, maintenance, and operation of said plants and

properties, with full power to make rules for the control and maintenance of said plants and properties."  Metro Charter, App. 3, Art. 42, § 15.  The Charter grants NES "exclusive management and control of the operation of said electric power plant and/or distribution system."  *Id.*, § 18.

Because the Charter grants NES power over Metro Nashville's electrical power plant and distribution system, NES has "exclusive jurisdiction within [that] particular field."  Metro Charter, Art. 2, § 2.01, ¶ 36.

Section 24 of Article 42 addresses the exclusive nature of the powers granted to NES under the Charter:

> [N]either the mayor, the metropolitan council, nor any other officer, department, board or commission of the metropolitan government, shall have or exercise any authority whatsoever over the electric power board created under the terms and provisions of this Charter, other and except to the extent herein expressly provided, and the provisions of this article shall prevail over any conflicting provisions appearing in any other article in this Charter.

Metro Charter, App. 3, Art. 42, § 24.

Plaintiffs argue that the preceding provisions of the Metro Charter grant NES full and exclusive authority over the Electric Power Board's electric distribution system and properties, including exclusive authority to regulate attachments to NES-owned utility poles, such that Defendants exceeded their authority under the Charter in adopting the Ordinance.  As a result, Plaintiffs say the Ordinance is *ultra vires* and invalid.  The Court agrees.

It is clear that the Charter grants NES broad, unencumbered power to manage and control the properties of the Electric Power Board.  It expressly denies that power to the Mayor, the Council, and any other agency of the Metro Nashville government.

Metro Charter, App. 3, Art. 42, § 24.  Further, to the extent Defendants' authority to manage the public rights-of-way overlaps or conflicts with NES's authority to regulate its properties, NES's authority "prevail[s]."  *See id.*

NES's utility poles indisputably constitute part of the Electric Power Board's "properties" and part of its electric distribution system.  Therefore, Appendix 3 of the Charter grants NES: (1) the "full control over the . . . maintenance[] and operation of said [utility poles], with full power to make rules for the control and maintenance of said [poles]"; and (2) "exclusive management and control of the operation of [its utility poles]."  *See* Metro Charter, App. 3, Art. 42, §§ 15, 18.

Nevertheless, Defendants argue that the Ordinance reflects a proper exercise of Metro Nashville's authority to manage the public rights-of-way under its general police powers and that it does not implicate or conflict with NES's authority under Appendix 3 of the Charter; in making this argument, Defendants rely on the preamble to the Ordinance, which states that its purpose is "to facilitate the efficient construction or upgrade of communications networks on utility poles located in the public rights-of-way while promoting and protecting public safety and reducing inconvenience to [Metro Nashville] residents and businesses from the construction."  This argument is unavailing.

Contrary to Defendants' position, it is clear that the Ordinance infringes on NES's exclusive powers; it purports to control NES's operation of its utility poles by directly regulating how Make-Ready Work must be performed on those poles.

Specifically, the Ordinance regulates: (1) when Make-Ready Work may be performed on NES-owned poles; (2) who may perform the work; (3) the steps a New

Attacher must take to be able to perform Make-Ready Work, including when it must send notice of the proposed work and to whom it must send the notice; (4) who is responsible for covering certain expenses; and (5) when field inspections or meetings must be conducted and who makes relevant determinations in relation to that process.

The Ordinance is a direct regulation of the timing, terms, and conditions of attaching to NES's utility poles, as opposed to an exercise of Metro Nashville's power to manage the public rights-of-way. AT&T makes the case for why the Ordinance is not a regulation on the rights-of-way:

> [T]he . . . Ordinance does not directly regulate access to the public rights-of-way. It does not establish any permitting process, or impose limitations or conditions on access to the public rights-of- way. It does not limit the number of visits any utility may make to perform work on poles in the rights-of-way, limit the hours during which work may occur, or impose construction or safety standards for work in the public rights-of-way. At best, it may have some indirect impact on the number of times communications providers send technicians to work in the public rights-of-way, but even that would be an indirect effect as the Ordinance does not mandate such a result – i.e., it does not forbid existing attachers from performing make-ready work on their facilities, or compel new attachers to perform make-ready work on the facilities of existing attachers.

[Doc. 43, PgID 496].

Based on the foregoing, the Court finds that the Ordinance clearly infringes upon NES's exclusive power to "make rules for the control and maintenance" of its utility poles, and its exclusive authority to "manage[] and control . . . the operation" and "maintenance" of those poles. *See* Metro Charter, App. 3, Art. 42, §§ 15, 18.

Moreover, the Ordinance directly exerts control over NES – the owner of the poles on which the Make-Ready Work will be performed – by requiring that it: (1) grant New Attachers access to its poles; (2) permit New Attachers to move and rearrange Existing Attachments in compliance with specified terms; (3) instruct New Attachers

where to place their Attachments; and (4) maintain a list of pre-approved contractors authorized to perform Make-Ready Work.  The Ordinance also purports to supersede the Attachment Agreements NES entered into with Plaintiffs and other Existing Attachers.  By adopting the Ordinance, not only did the Metro Nashville Council and Mayor Barry exert control over NES by requiring it to comply with the requirements of the Ordinance; they supplanted the authority NES already exercised over the management and operation of its utility poles under pole Attachment Agreements.  This is a violation of the Metro Charter.  *See* Metro Charter, App. 3, Art. 42, § 24 (stating that the Mayor and the Metro Nashville Council, among others, cannot "exercise any authority whatsoever over the electric power board").

The Ordinance conflicts with the exclusive authority granted to NES under the Charter.  This exclusive authority prevails over Metro Nashville's power to regulate the public rights-of-way.  *See id.* ("the provisions of this article shall prevail over any conflicting provisions appearing in any other article in this Charter"); *see also Metro. Elec. Power Bd. v. Metro. Gov't of Nashville & Davidson Cty.*, 309 S.W.3d 474, 477 (Tenn. Ct. App. 2008) (explaining that Metro Nashville's power to manage its public rights-of-way "must be read in light of the language in Article 42, Section 24, stating that [NES's powers] prevail over conflicting provisions. . . .").

Defendants' adoption of the Ordinance exceeded their authority and violated the Charter.  Accordingly, the Ordinance "is *ultra vires* and void or voidable" as it applies to NES-owned poles.  *See Baird*, 756 S.W.2d at 241.

### 4. Plaintiffs May Amend Their Complaints

Defendants say the Court should dismiss this claim because: (1) NES is an indispensable party under Fed. R. Civ. P. 19, which Plaintiffs failed to join; and (2) Plaintiffs did not specifically cite to the Tennessee Declaratory Judgment Act in their complaints.  Neither argument justifies dismissal.

Defendants say NES is an indispensable party under Fed. R. Civ. P. 19(a).  In relevant part, Rule 19 states:

> A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if . . . that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>
> > (i) as a practical matter impair or impede the person's ability to protect the interest; or
> >
> > (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1)(B).  *See also*, Tenn. Code Ann. § 29-14-107 (When a declaration is sought under the Tennessee Declaratory Judgment Act, "all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceedings.").

Plaintiffs dispute whether NES "claims an interest" in this case.  In its motion for leave to file an *amicus* brief, NES stated that it is "agnostic to the validity of the ordinance."  [Doc. 67, PgID 967].  Plaintiffs say this means NES is not taking a position one way or the other, so it is not an indispensable party.  However, because the

outcome will affect the Make-Ready Process for NES-owned poles, NES has a direct interest in how the case resolves and must be made a party.

Despite Defendants' request, the Court will not dismiss the claim based on Plaintiffs' failure to join NES. Failure to join an indispensable party does not mandate dismissal. Rather, "[i]f a person has not been joined as required, the court must order that the person be made a party." *See* Fed. R. Civ. P. 19(a)(2).

Moreover, although Plaintiffs did not invoke the Tennessee Declaratory Judgment Act in their complaints, they made it clear that they were seeking declaratory and injunctive relief. Defendants are on notice of the claim asserted and relief sought. Plaintiffs' failure to specifically cite the Act was a minor technical mistake and does not warrant dismissal. *See Johnson v. City of Shelby*, 135 S. Ct. 346, 346-47 (2014) (per curiam) (summarily reversing order that dismissed complaint "for failure to invoke 42 U.S.C. § 1983" because the federal rules: (1) "are designed to discourage battles over mere form of statement"; (2) seek to "avoid civil cases turning on technicalities"; and (3) "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted" (citations omitted)).

The Court will allow Plaintiffs to amend their complaints to invoke the Tennessee Declaratory Judgment Action and add NES as a party. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). Plaintiffs' amended complaints are due **December 6, 2017**.

Plaintiffs must serve their amended complaints and this Order on counsel for NES – who has appeared to file an *amicus* brief – within one week of filing the amended complaint(s). Because NES's counsel has already appeared, this is feasible.

Within one week of being served, NES must file a brief statement – not more than one page in length – stating whether it intends to take a position now.  If it continues to have no position, the Court will enter the declaration and injunction sought by Plaintiffs.  If NES does intend to take a position, the statement it files must state as such; NES may then answer or otherwise respond to the amended complaint.

**C.  Count III – Plaintiffs Fail to Establish that the Ordinance Violates the Contract Clauses of the United States and Tennessee Constitutions**

Plaintiffs' final claim is that the Ordinance substantially impairs their Attachment Agreements with NES, in violation of the Contract Clauses of the United States and Tennessee Constitutions.

**1.  The Contract Clause of the United States Constitution**

***a.    The Applicable Standard***

The United States Constitution prohibits states from "pass[ing] any . . . Law impairing the Obligation of Contracts."  U.S. Const. art. I, § 10, cl. 1.  "Although the language of the Contract Clause is facially absolute, its prohibition must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.'"  *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 410 (1983) (citation omitted).

In *Energy Reserves*, the Supreme Court articulated a three-part inquiry for evaluating Contract Clause challenges.  "The threshold inquiry is 'whether the state law has, in fact, operated as a substantial impairment of a contractual relationship.'"  *Id.* at 411 (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978)).  If a plaintiff demonstrates that the "state regulation constitutes a substantial impairment, the [burden shifts to the] State [to show] a significant and legitimate public purpose behind

the regulation." *Id.* "Once a legitimate public purpose has been identified, the [final] inquiry is whether the adjustment of 'the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption.'" *Id.* at 412 (citations and internal brackets omitted); *see also Welch v. Brown*, 551 Fed. Appx. 804, 810 (6th Cir. 2014) (the final inquiry requires a court to determine whether the impairment is "reasonable and necessary" to serve the stated public purpose).

"Unless the State itself is a contracting party . . . courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Id.* at 412-13 (citations omitted).

The parties dispute whether heightened scrutiny applies because NES was a contracting party. However, the Court need not resolve this dispute. The heightened scrutiny standard of review applies under the third prong of the analysis; Plaintiffs fail to establish that the Ordinance operates as a substantial impairment to their Attachment Agreements with NES, making the first inquiry dispositive.

> **b.    Plaintiffs Fail to Establish that the Ordinance is a Substantial Impairment of their Attachment Agreements with NES**

Plaintiffs say the Ordinance's Make-Ready Process – which allows a New Attacher to perform Make-Ready Work on Existing Attachments 15 days after giving notice to the applicable Existing Attacher (or 30 days for Complex Make-Ready Work) – substantially impairs their Attachment Agreements with NES.

Determination of whether a state law substantially impairs a contract requires courts to consider: "(1) whether there is a contractual relationship; (2) whether a change

in law impairs the contractual relationship; and (3) whether the impairment is substantial." *Puckett v. Lexington-Fayette Urban Cty. Gov't*, 833 F.3d 590, 599–600 (6th Cir. 2016) (citations omitted).

Defendants argue, *inter alia*, that: (1) the Ordinance does not impair Plaintiffs' Attachment Agreements with NES; and (2) Plaintiffs fail to present objective evidence demonstrating that the Ordinance substantially impairs their agreements.

The Ordinance does impair Plaintiffs' Attachment Agreements with NES, Defendants' contention notwithstanding. However, Plaintiffs fail to establish that the Ordinance operates as a substantial impairment of their Attachment Agreements.

"Although the Supreme Court has yet to develop a formal test for assessing the substantiality of a contractual impairment, the dividing line falls somewhere between the 'total destruction of contractual expectations,' and 'laws which restrict a party to those gains reasonably to be expected from the contract.'" *Borman, LLC v. 18718 Borman, LLC*, 777 F.3d 816, 826 (6th Cir. 2015) (internal citations and brackets omitted). "In other words, an impairment takes on constitutional dimensions only when it interferes with reasonably expected contractual benefits." *Id.*; *see also Exxon Corp. v. Eagerton*, 462 U.S. 176, 190 (1983) ("Th[e Supreme] Court has long recognized that a statute does not violate the Contract Clause simply because it has the effect of restricting, or even barring altogether, the performance of duties created by contracts entered into prior to its enactment.").

AT&T claims that the Ordinance "plainly operates as a substantial impairment" of its Attachment Agreement with NES because it "maintains responsibility" for performing Make-Ready Work on its Attachments under the AT&T Agreement, and because

nothing in that agreement allows Metro Nashville to either move its Attachments (except in the event of an emergency) or grant such right to a third party. AT&T says its right to oversee and control work on its network "plainly is an important right," and the Ordinance deprives it of an adequate opportunity to: (1) assess the potential for network disruption caused by Make-Ready Work, and (2) oversee the work on its Attachments to ensure harm to its network is minimized.

Comcast argues that the Ordinance substantially impairs its Attachment Agreement with NES because "[t]here can be no doubt that Comcast reasonably expected that it would obtain the benefit of the 60-day make-ready window promised in the [agreement]." Comcast says a 60-day period to perform Make-Ready Work is critical to safeguarding its network; Comcast relies on the FCC's 2011 Pole Attachment Order in support of this proposition.

Comcast's reference to the 2011 Pole Attachment Order does not support its position. The Comcast Agreement requires Comcast to perform its Make-Ready Work within 30 days of receiving notice from NES. While NES cannot move Comcast's Attachments until the 60th day under the Comcast Agreement, Comcast is subject to a five-dollar penalty for each day it goes over the thirtieth (30th) day without moving its Attachments. This conflicts with the FCC's 60-day period for performing Make-Ready Work.

The FCC's procedure setting 60 days for Make-Ready Work is the only objective evidence Comcast relies on for its argument that it reasonably expected 60 days to perform Make-Ready Work under its Attachment Agreement with NES. However, because the Comcast Agreement sets a shorter timeframe for Comcast to complete

Make-Ready Work, Comcast's reliance on the FCC's 60-day Make-Ready Process is misguided. Comcast's reliance on the 2011 Pole Attachment Order is further undermined based on the FCC's encouragement to set shorter timeframes for Make-Ready Work. *See* 2011 Pole Attachment Order, 26 FCC Rcd. at 5258 ¶ 32 ("we encourage utilities to maintain or improve upon these shorter timeframes when feasible"). The 2011 Pole Attachment Order does not support Comcast's statement that it reasonably expected a 60-day Make-Ready Process in its Attachment Agreement with NES.

Other than Comcast's reference to the 2011 Pole Attachment Order, neither Plaintiff cited to objective evidence or any other proper evidence for the summary judgment stage. Rather, Plaintiffs relied on conclusory statements without support. For example, Plaintiffs summarily state that the Ordinance "plainly operates" as a substantial impairment, and that the right to perform their own Make-Ready Work and oversee work on their network is "plainly important."

In determining whether a state regulation substantially impairs a contractual provision under the Contract Clause, unsupported and conclusory statements are not enough. *See United States v. Cty. of Muskegon*, 298 F.3d 569, 585 (6th Cir. 2002) (when evaluating whether a party was induced by or relied on a contractual provision, "speculation cannot suffice; [the Court] need[s] proof."). *See also Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009) ("Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment."); Fed. R. Civ. P. 56(c)(1)(A) (requiring a party to support facts by "citing to particular parts of materials in the record, including depositions, documents,

electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials. . . .").

Because no objective evidence is presented which demonstrates that Plaintiffs rely on, or relied on, the provisions in their Attachment Agreements requiring that they perform their own Make-Ready Work either promptly (for AT&T) or within 30 days of notice (for Comcast), Plaintiffs cannot show that the Ordinance substantially impairs their contractual expectations. *See Energy Reserves,* 459 U.S. at 411-12; *Cty. of Muskegon,* 298 F.3d at 584-85.

Finally, although the Ordinance shortens the time for Plaintiffs to perform their own Make-Ready Work, the concerns Plaintiffs allege regarding the ability to oversee their networks do not amount to a substantial impairment . The Ordinance safeguards Plaintiffs' interest in oversight. It requires New Attachers to use NES-approved contractors; gives Plaintiffs an opportunity to inspect the Make-Ready Work after it is performed, at the New Attacher's expense; and requires the New Attacher to perform any necessary remedial work after it finishes Make-Ready Work.

Because Plaintiffs fall short of demonstrating that the Ordinance operates as a substantial impairment of their Attachment Agreements with NES, their Contract Clause claims under the United States Constitution fail. *See Cty. of Muskegon*, 298 F.3d at 585. Defendants are entitled to summary judgment on this claim.

### 2. The Contract Clause of the Tennessee States Constitution

The Tennessee Constitution provides that "no retrospective law, or law impairing the obligations of contracts, shall be made." Tenn. Const. art. I, § 20.

The Tennessee Supreme Court has found, and the parties agree, that "[t]he meaning of the federal and state provisions [are] identical." *First Util. Dist. of Carter Cty. v. Clark*, 834 S.W.2d 283, 287 (Tenn. 1992).

Accordingly, the Court finds it unnecessary to analyze the constitutionality of the Ordinance separately under the Tennessee Contract Clause. *See West v. Wilson*, No. 03A01-9409-CH-00348, 1995 WL 96796, at *2 (Tenn. Ct. App. Mar. 9, 1995) (finding it "unnecessary to discuss the constitutionality of [a] statute separately as it relates to the United States Constitution and the Tennessee Constitution").

For the same reasons articulated above, Defendants are entitled to summary judgment on Plaintiffs' Contract Clause claim under the Tennessee Constitution.

### D.    Plaintiffs' Official Capacity Claims

Defendants argue that the Court should dismiss Plaintiffs' official capacity claims against Mayor Barry and Director Sturtevant because they are duplicative of claims made against Metro Nashville.

Although Defendants are correct that an official capacity claim for damages is the same as a claim against the municipality itself, official capacity claims for injunctive relief are different. *See Steinberg v. Gray*, 815 F. Supp. 2d 293, 299 (D.D.C. 2011) ("[Plaintiff's] official-capacity claims for injunctive relief . . . are not the equivalent of claims against the District. . . . Consequently, they are not redundant." (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 n. 10 (1989) ("official-capacity actions for prospective relief are not treated as actions against the State")).

Plaintiffs' request for attorney fees under 42 U.S.C. § 1983 is the only claim equivalent to a claim against Metro Nashville. However, Plaintiffs' request for attorney

fees is made under their federal and state Contract Clauses claim, on which Defendants are entitled to summary judgment. Therefore, there is no need to separately dismiss that claim against Mayor Barry and Director Sturtevant.

As to Plaintiffs' official capacity claims against Mayor Barry and Director Sturtevant for injunctive relief, they are not the equivalent of claims against Metro Nashville, nor are they are redundant. *See Steinberg*, 815 F. Supp. 2d at 299. The Court will not dismiss those claims. *Id.*

## V.  CONCLUSION

The Court **GRANTS IN PART**, **DENIES IN PART**, and **RESERVES RULING IN PART** on Plaintiffs' motions for summary judgment [Docs. 44, 49] and Defendants' motion for summary judgment [Doc. 77], as follows:

1.      Plaintiffs' motions are **GRANTED**, and Defendants' motion is **DENIED** on Claim I. The Court **DECLARES** that the Ordinance is preempted by federal law as applied to utility poles owned by AT&T and other private parties. Defendants are **PERMANENTLY ENJOINED** from applying the Ordinance to utility poles owned by AT&T and other private parties;

2.      On Count II, the Court **RESERVES RULING**. Plaintiffs may amend their complaints by December 6, 2017, to add NES as a party and to invoke the Tennessee Declaratory Judgment Act. Plaintiffs must serve NES with their amended complaint and this Order within one week of

filing the amended complaints.  NES must file a preliminary

response, as explained above, within one week of being

served, and may further answer or respond as permitted by

the Federal Rules of Civil Procedure;

3.      The Court **GRANTS** Defendants' motion and **DENIES**

Plaintiffs' motions on Count III.  The Court grants Defendants

summary judgment on Plaintiffs' claims under the Contract

Clauses of the United States and Tennessee Constitutions.

Defendants' motion to allow time for discovery [Doc. 65] is **DENIED**.

**IT IS ORDERED**.

S/Victoria A. Roberts
Victoria A. Roberts
United States District Judge
Sitting by Special Designation

Dated:  November 21, 2017